# DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

DEVJANI MISHRA
JEREMI L. CHYLINSKI
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
Tel.: (212) 218-5500
Fax: (212) 218-5526

Attorneys for Defendants The TJX Companies, Inc.,
Rick Kaiser, and Armando Cabrera

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| EILEEN CONNOLLY, PAULETTE HONICK, DARLENE LELLE, and LORRAINE SERRAINO, | : **ECF CASE** |
|  | : 07-CV-3282 (JS) (WDW) |
| Plaintiffs, | : |
|  | : |
| -against- | : |
|  | : |
| THE TJX COMPANIES, INC., RICK KAISER, and ARMANDO CABRERA, | : |
|  | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' LOCAL CIVIL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the

Eastern Districts of New York, Defendants The TJX Companies, Inc., Rick Kaiser, and Armando

Cabrera (together, "Defendants") submit this statement of material facts as to which they contend

there is no genuine issue to be tried.[1]

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all pleadings, deposition testimony and deposition exhibits cited herein are annexed to the accompanying Declaration of Devjani Mishra, dated October ___, 2009 ("Mishra Decl.").

**Background - Parties**

1.      TJX owns and operates T.J. Maxx retail stores throughout the United States.  These

stores sell discount merchandise such as apparel, domestics, jewelry and accessories.  (Aff. of

Sheila Black).

2.      T.J. Maxx operates a store in Kings Park, New York ("the Kings Park location").  (Aff.

of Sheila Black).

## CONNOLLY

3.      Plaintiff Eileen Connolly ("Connolly") was born on April 16, 1962.  (Connoly Dep. 90).

4.      Connolly is a high school graduate.  (Connolly Dep. 18).

5.      Connolly began working for T.J. Maxx on October 20, 1998 as an Associate.  (Connolly

Dep. 90).

6.      Connolly's employment with T.J. Maxx was terminated on June 23, 2005 for violation of

the company's layaway policy and causing loss to the company.  (TJX 156-61).

## HONICK

7.      Plaintiff Paulette Honick ("Honick") was born on February 17, 1953.  (Honick Dep. 16).

8.      Honick is a high school graduate.  (Honick Dep. 17).

9.      Honick began working for T.J. Maxx on October 28, 1998 as an Associate.  (Honick Dep.

20; TJX 194).

10.     Honick employment with T.J. Maxx was terminated on June 23, 2005 for violation of the

company's layaway policy and causing loss to the company.  (TJX 168-70).

## LELLE

11.     Plaintiff Darlene Lelle ("Lelle") was born on August 30, 1956.  (Lelle Dep. 17).

12.     Lelle is a high school graduate.  (Lelle Dep. 20).

13.     Lelle began working for T.J. Maxx on October 28, 1998 as an Associate. (Lelle Dep. 38-39).

14.     Lelle's employment with T.J. Maxx was terminated on June 23, 2005 for violation of the company's layaway policy and causing loss to the company. (TJX 162–64).

### SERRAINO

15.     Plaintiff Lorraine Serraino ("Serraino") was born on July 25, 2009. (Serraino Dep. 16).

16.     Serraino is a high school graduate. (Serraino Dep. 21-22).

17.     Serraino began working for T.J. Maxx on October 19, 1998 as an Associate. (Serraino Dep. 35-36).

18.     Serraino's employment with T.J. Maxx was terminated on June 23, 2005 for violation of the company's layaway policy and causing loss to the company. (TJX 165-67).

### TJX

19.     TJX is an Equal Opportunity Employer that absolutely prohibits unlawful discrimination, harassment and retaliation in the workplace. (TJX 77-104).

20.     Specifically, TJX maintains a Code of Conduct that, among other things, explicitly prohibits any form of discrimination, harassment or retaliation at all stages of the employment relationship. (TJX 83-84).

21.     TJX adheres to an open door policy, memorialized in the Code of Conduct, pursuant to which employees may bring a complaint of unlawful conduct to any number of people within the organization. (TJX 81).

22.     TJX maintains a telephone hotline through which employees may make anonymous complaints. (TJX 81).

23.     Each of the Plaintiffs admits that she was provided with copies of the above-described written policies during the course of their employment with T.J. Maxx. (TJX 105-108; Serraino Dep. 42-43; Honick Dep. 29-30; Lelle Dep. 47-48; Connolly Dep. 40-41).

## KAISER

24.     Defendant Rick Kaiser ("Kaiser") began his employment with T.J. Maxx on February 15, 1999 as an Assistant Store Manager. ((TJX 0001; Kaiser Dep. 12).

25.     In 2002, Kaiser was promoted to Store Manager and was transferred to the Kings Park location. (Kaiser Dep. 13).

26.     During his time as a Store Manager in the Kings Park location, Kaiser supervised each of the four plaintiffs in this action. (Kaiser Dep. 5-7).

27.     In March 2006, Kaiser asked to be demoted to the Assistant Store Manager position due to the stress level involved with the Store Manager position and to improve his quality of life. (Kaiser Dep. 17; Cabrera Dep. 33-34; TJX 331-32).

28.     Kaiser currently works as the Assistant Store Manager at T.J. Maxx's Riverhead, New York store. (Kaiser Dep. 15).

## CABRERA

29.     Armando Cabrera ("Cabrera") began his employment with T.J. Maxx as a Store Manager on June 25, 2001. (Cabrera Dep. 22; TJX 335).

30.     In October 2003, Cabrera was promoted to District Manager. (Cabrera Dep. 28).

31.     After his promotion, Cabrera was responsible for supervising five T.J. Maxx locations: Commack, Riverhead, Bridgehampton, Massapequa, and Hicksville. (Cabrera Dep. 30).

32.     Cabrera currently supervises eleven T.J. Maxx stores: Rosedale, Oceanside, Massapequa, Hicksville, Commack, Kings Park, Selden, Islandia, Bridgehampton, Riverhead, and Carle Place. (Cabrera Dep. 32).

## Allegations By Lelle of Poor Store Conditions and Sexual Harassment Against Kaiser

33.     On or about January 20, 2005, Lelle telephoned Cabrera and requested an in-person meeting to discuss what she called a "frustrating" experience. (Lelle Dep. 164-67; Cabrera Dep. 104-05).

34.     Cabrera met with Lelle on January 24, 2005 at his office in Commack, New York to discuss her concerns. (TJX 111-15).

35.     At the meeting, Lelle presented Cabrera with a one-page typed statement. (Lelle Dep. 168-73; TJX 109).

36.     Lelle testified that she wrote the statement the night before she met with Cabrera. (Lelle Dep. 170).

37.     The bulk of Lelle's statement concerned her "frustration" with her belief that Kaiser had created "double work" by failing to provide her with clear instructions on condensing clearance coats. (TJX 109).

38.     Lelle also alleged that Kaiser "has made inappropriate comments repeatedly and has made [her] feel uncomfortable." (TJX 109).

39.     Lelle alleged that Kaiser "thinks he's just joking around but [she thinks] he has a warped sense of humor and focuses on foul things." (TJX 109).

40.     Finally, Lelle alleged that she thought it "very difficult to work effectively under these conditions and felt it necessary to voice these feelings." (TJX 109).

41.     The same day he met with Lelle, January 24, 2005, Cabrera prepared notes detailing the topics discussed in the meeting. (TJX 110).

42.     Cabrera described Lelle's allegations in his notes, stating that Lelle was "frustrated with [Kaiser's] management style of creating double work for associates." (TJX 110).

43.     Cabrera noted that Lelle complained that Kaiser "did not communicate with associates what needed to be completed" and that Kaiser "made comments to another associate how he did not know what [Lelle] was doing in front of the Misses Department." (TJX 110).

44.     Cabrera also noted Lelle's complaint about Kaiser's allegedly inappropriate conduct. (TJX 110).

<u>The Investigation Into Lelle's Complaint</u>

45.     Immediately after his meeting with Lelle, Cabrera phoned David Del Vecchio ("Del Vecchio"), Regional Recruitment Manager, and informed him of Lelle's complaint. (Cabrera Dep. 114-16; TJX 111-15).

46.     Del Vecchio and his supervisor, Fran Cetrone ("Cetrone"), Regional Manager of Human Resources, traveled to the Kings Park location to investigate the matter two days later, on January 26, 2005. (TJX 111-15; Cabrera Dep. 119-20).

47.     Del Vecchio and Cetrone spoke with Connolly first. (TJX 111).

48.     Connolly advised Del Vecchio and Cetrone of her belief that Kaiser did not provide enough support for the back room function at the store. (TJX 111).

49.     After Cetrone and Del Vecchio probed into Kaiser's interactions with his co-workers genreally, Connolly revealed for the first time that Kaiser often joked inappropriately by making sexual comments. (TJX 111).

50.   Connolly stated that she knew Kaiser was "just joking" and never told him that his comments made her uncomfortable. (TJX 111).

51.   Connolly also stated that she did not want to get Kaiser "in trouble", but just wanted the store to be better managed and the comments to stop. (TJX 111).

52.   Connolly further alleged that Lelle and co-worker Paulette Honick had witnessed some of Kaiser's comments. (TJX 112).

53.   After speaking with Connolly, Cetrone and Del Vecchio then spoke with Honick. (TJX 112).

54.   When asked about Kaiser, Honick stated "how much she liked Rick." (TJX 112).

55.   Honick also advised Cetrone and Del Vecchio that the employees at the store were "like family." (TJX 112).

56.   Honick also alleged that Kaiser sometimes joked inappropriately, though she admitted that they all did at times and that the staff would "all laugh and sometimes join in on the joke." (TJX 112).

57.   Honick also admitted that she never complained to Kaiser or anyone else about his comments. (TJX 112).

58.   When asked what she would like done, Honick said only that she wanted the comments to stop. (TJX 112).

59.   After speaking with Honick, Del Vecchio and Cetrone then spoke with Lelle. (TJX 112).

60.   Lelle began the conversation by stating that her chief reason for complaining to Cabrera was to address Kaiser's poor management, which often led to "double work." (TJX 112-13).

61.   Lelle also alleged that Kaiser made inappropriate sexual comments when he joked with the staff; however, she added that she "usually found them funny" and that the employees at the

7

store were "like family" and often joked around and made comments that they should not make. (TJX 113).

62.    Lelle also stated that she liked Kaiser and only wanted the store to perform better and his comments to stop.  (TJX 113).

63.    Cetrone and Del Vecchio then asked whether there was anyone else they should talk to about Kaiser, and Lelle recommended that they speak to Serraino.  (TJX 113).

64.    Serraino also alleged that store standards had slipped and that Kaiser joked inappropriately.  (TJX 114).

65.    Serraino stated that she believed Kaiser felt comfortable making such comments because they had all worked together for a long time and were "like family."  (TJX 114).

66.    Serraino admitted, however, that they all "sometimes" got "carried away" with their jokes.  (TJX 114).

67.    Serraino also stated that all of the employees, not just Kaiser, needed to stop making inappropriate comments.  (TJX 114).

68.    In addition, Serraino confirmed that she never raised this issue with anyone because it had never been a concern.  (TJX 114).

69.    Cetrone and Del Vecchio then spoke with Assistant Store Manager Yun Nguyen ("Nguyen").  (TJX 114).

70.    Nguyen also stated that Kaiser sometimes joked inappropriately.   (TJX 114).

71.    Cetrone and Del Vecchio talked with other store associates, but no other concerns were raised.  (TJX 113).

72.    Cetrone and Del Vecchio then met with Kaiser concerning the allegations.  (TJX 114-15; Kaiser Dep. 64-65; Cabrera Dep. 120-21).

73.     Kaiser admitted that he sometimes made jokes or comments that could be deemed inappropriate. (TJX 114-15; Kaiser Dep. 64-65)

74.     Cetrone and Del Vecchio instructed Kaiser to immediately cease making any such comments and that all conversations with his co-workers must be business related. (TJX 114-15; Cabrera Dep. 120-21).

75.     Kaiser agreed to adhere to this directive. (TJX 115).

76.     Kaiser was further instructed to promptly hold a meeting with all of the store's employees, at which he was to (i) apologize for any inappropriate comments, (ii) direct that all future conversations in the store be business related, (iii) direct that all employees cease engaging in any inappropriate conversations of a sexual or discriminatory nature, and (iv) thank the employees for utilizing the Company's open door policy. (Kaiser Dep. 69; Cabrera Dep. 123-25; TJX 115; TJX 120).

77.     In addition, at Cabrera's request, Kaiser prepared a written statement documenting his conversation with Cetrone and Del Vecchio. (Kaiser Dep. 65-67; TJX 116-19).

78.     Due to his participation in conversations of an inappropriate nature with his coworkers, Kaiser received a written Final Warning. (TJX 120).

79.     Cabrera advised Kaiser that he would be terminated for any further transgressions of the company policy. (Cabrera Dep. 121).

80.     Kaiser held an associate meeting on February 1, 2005 and apologized as directed. (Cabrera Dep. 69; Kaiser Dep. 123-25).

81.     Thereafter, Cabrera visited the store on a weekly basis and confirmed, by speaking generally with the store associates, that Kaiser's objectionable conduct had ceased. (Cabrera Dep. 125-27; Kaiser Dep. 71).

9

## Plaintiffs' Abuse of the TJX Layaway Policy

82.   T.J. Maxx provides both customers and employees the opportunity to purchase merchandise on layaway. (Aff. of Sheila Black; TJX 124).

83.   Pursuant to written store policy, layaway merchandise must be picked up and paid for within thirty days. (Aff. of Sheila Black; TJX 124).

84.   Store policy explicitly provides that employee layaways not paid for within this time period must be returned to the sales floor. (Aff. of Sheila Black; TJX 135-37).

85.   It also provides that employee layaways may not be extended beyond thirty days. (Aff. of Sheila Black; Cabrera Dep. 61-63, 100-01; Kaiser Dep. 25).

86.   The purpose of this policy is to ensure that T.J. Maxx has the opportunity to sell merchandise to customers and that employees do not abuse discount privileges. (Aff. of Sheila Black).

87.   T.J. Maxx has in place a Loss Prevention Department, which is responsible for minimizing the extent to which individual stores, and the company as a whole, loses money due to theft or loss of T.J. Maxx assets. (Aff. of Sheila Black).

88.   To do this, Loss Prevention personnel engage in such activities as undercover surveillance of customer and employee activities. (Aff. of Sheila Black).

89.   Upon being hired, Loss Prevention employees attend a five week long orientation and training program through which they receive both classroom and role play training in the policies and procedures of Loss Prevention. (Aff. of Sheila Black).

90.   Loss Prevention staff are reviewed and supervised by Loss Prevention managers. (Aff. of Sheila Black).

10

91.    Loss Prevention can start any investigation that they deem necessary, at any time, and they do not need to make store managers, district managers or any other non-Loss Prevention employee aware of the investigation. (Cabrera Dep. 134-137).

92.    In early 2005, Karen Hennessey ("Hennessey"), a Regional Analyst for Loss Prevention, was responsible for the daily review of cashier, refund, and other internal retail reports for each store within her region, for the purpose of identifying possible employee fraud. (Aff. of Sheila Black).

93.    This practice was done for all of the T.J. Maxx stores in the region, and the reports did not reflect the names of any of the employees; rather, each employee was identified only by numbers. (Aff. of Sheila Black).

94.    In reviewing the reports, Hennessey identified a pattern in one of the reports that raised a suspicion of possible violation of the Company's layaway policy by certain employees at the Kings Park location. (Aff. of Sheila Black).

95.    Because the report she reviewed did not contain employee names, Hennessey did not know which particular employees were implicated. (Aff. of Sheila Black).

96.    Soon thereafter, the local Loss Prevention personnel commenced an investigation into this unusual layaway activity, which included a high number of layaway cancellations, deletions and delayed purchases. (Aff. of Sheila Black).

97.    As part of the investigation, the Loss Prevention personnel traced and reviewed patterns of layaways, markdowns and purchases of all employees in the Kings Park location. (Aff. of Sheila Black).

11

98.    During the course of Loss Prevention investigations, the information remains confidential

within the Loss Prevention department to preserve the investigation's integrity. (Aff. of Sheila

Black).

99.    The managers within a store - in this case, Kaiser - and the District Manager - Cabrera -

are not advised of an investigation until after the investigation has been completed. (Aff. of

Sheila Black; Cabrera Dep. 131-35, 142, 151; Kaiser Dep. 77-78).

100.    Similarly, it was only after determining that Company policy violations had taken place

that Loss Prevention informed the Human Resources Department of its investigation into the

Kings Park location. (Aff. of Sheila Black).

101.    The Kings Park investigation revealed that employees Connolly, Honick, Lelle, Serraino,

Carol Hobel ("Hobel"), and Phyllis Ferraro ("Ferraro") regularly rolled over their layaway

merchandise in thirty day intervals, waiting for numerous markdowns to accumulate and then

applying those significant markdowns to their layaway merchandise. (Aff. of Sheila Black; TJX

194-330; Honick Dep. 170-75, 180-84; Serraino Dep. 197, 203; Lelle Dep. 240-42; Connolly

Dep. 136-38, 139-42).

102.    The employees did this by deleting or cancelling their merchandise from the store's

layaway database on or about the thirty-first day, and then immediately placing the same

merchandise back on layaway. (Aff. of Sheila Black; TJX 194-330; Honick Dep. 170-75, 180-

84; Serraino Dep. 197, 203; Lelle Dep. 240-42; Connolly Dep. 136-38, 139-42).

103.    In addition, these employees continued rolling the merchandise over in this manner until

the same merchandise on the sales floor had been marked down many times. They then applied

the accumulated markdowns to their layaway merchandise and purchased the merchandise at the

12

substantially reduced price. (Aff. of Sheila Black; TJX 194-330; Honick Dep. 170-75, 180-84; Serraino Dep. 197, 203; Lelle Dep. 240-42; Connolly Dep. 136-38, 139-42).

104. The conduct of Connolly, Honick, Lelle, Serraino, Hobel, and Ferraro was a clear violation of Company policy and resulted in financial loss to the Company, which was deprived of the ability to offer this merchandise to its customers. (Aff. of Sheila Black).

105. As part of the loss prevention investigation, Connolly, Honick, Lelle, Serraino, and Hobel were each individually interviewed by two members of the Loss Prevention team. (Aff. of Sheila Black; TJX 195, 197, 214-15, 253-54, 287-88).

106. Each interviewer and witness similarly prepared written statements regarding their meeting with each employee. (Aff. of Sheila Black; TJX 195, 197, 214-15, 253-54, 287-88; Honick Dep. 170-75, 180-84; Serraino Dep. 197, 203; Lelle Dep. 240-42; Connolly Dep. 136-38, 139-42).

107. Connolly was interviewed by Mark Ballew with Julia Santiago as a witness. (Aff. of Sheila Black; TJX 214-15; Connolly Dep. 128-29).

108. Honick was interviewed by William Jannson with Mary McCall as a witness. (Aff. of Sheila Black; TJX 195, 197; Honick Dep. 164-65).

109. Lelle was interviewed by Kevin Gillese with Karen Durant as a witness. (Aff. of Sheila Black; TJX 253-54; Lelle Dep. 234-36).

110. Serraino was interviewed by William Ahern with Mary McCall as witness. (Aff. of Sheila Black; TJX 287-88; Serraino Dep. 178-84).

111. Hobel was interviewed by William Jannson with Lori Wachtel as a witness. (Aff. of Sheila Black).

13

112.    Ferraro was not interviewed by Loss Prevention because she abandoned her job and failed to return to work after learning that her layaway policy violations had been uncovered and her coworkers interviewed. (Aff. of Sheila Black).

113.    During these meetings, in the presence of an interviewer and a witness, each of these employees admitted to engaging in the improper activity and violating Company policy. (Aff. of Sheila Black; TJX 194-330).

114.    In addition, Connolly, Honick, Lelle, Serraino, and Hobel each prepared a written statement admitting to the company violations and loss to the Company. (Aff. of Sheila Black; TJX 194-330).

115.    Connolly, Honick, and Serraino also signed Promissory Notes agreeing to repay T.J. Maxx the amount of loss they each respectively caused to T.J. Maxx. (TJX 196, 213, 286).

### Terminations

116.    When hired, each of the Plaintiffs signed the Company's Field Post Orientation Check List, acknowledging that they could be immediately discharged for acts of dishonesty or failure to follow established job procedures. (TJX 201-03, 222-23, 257-58, 291-92; Honick Dep. 32-33; Serraino Dep. 46-48; Lelle 52-54; Connolly Dep. 43-45).

117.    Consistent with this policy, the Plaintiffs were discharged for their violation of the Company's policy in performing numerous layaway rollovers and thereby causing loss to the company. (TJX 201-03, 222-23, 257-58, 291-92; Cabrera Dep. 142-45, 149; Kaiser Dep. 78-80).

118.    Neither Cabrera or Kaiser played any role in determining whether the Plaintiffs would be terminated; rather, when an employee violates company procedure and causes a loss to the company, termination is automatic. (Cabrera Dep. 142-45, 149; Kaiser Dep. 78-80).

14

119.    The Plaintiffs were terminated for violating company policy and causing a loss to the

company and for no other reason.   (Cabrera Dep. 142-45, 149; Kaiser Dep. 78-80; TJX 194-

330).


Dated: New York, New York
           October 15, 2009

                                                  SEYFARTH SHAW LLP


                                                  By: s/Devjani Mishra
                                                         Devjani Mishra
                                                         Jeremi L. Chylinski
                                                  620 Eighth Avenue
                                                  New York, New York 10018
                                                  (212) 218-5500

                                                  *Attorneys for Defendants The TJX Companies, Inc.,*
                                                  *Rick Kaiser, and Armando Cabrera*

                                            15