UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EILEEN CONNOLLY, PAULETTE HONICK,
DARLENE LELLE, and LORRAINE SERRAINO,

                               Plaintiffs,

      -against-

THE TJX COMPANIES, INC., RICK KAISER, and
ARMANDO CABRERA,

                               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ECF CASE**

07-CV-3282 (JS) (WDW)

## DEFENDANTS' SUPPLEMENTAL LOCAL CIVIL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Eastern Districts of New York, and pursuant to the Order of the Court dated August 2, 2010, Defendants The TJX Companies, Inc., Rick Kaiser, and Armando Cabrera (together, "Defendants") submit this Supplemental Statement of Undisputed Material Facts in support of their motion for summary judgment.

**Alleged Specific Incidents of Inappropriate Comments or Conduct by Mr. Kaiser**

1.    On one occasion, Mr. Kaiser allegedly commented about the bra and breast size of a customer that entered the store and had asked Mr. Kaiser where the bras for large women were located.  (Serraino Dep. 135:5-136:17; Honick Dep. 112:6-14; Connolly Dep. 113:3-114:14; Lelle Dep. 132:7-133:14).[1]

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all pleadings, deposition testimony and exhibits cited herein are annexed to the accompanying Declaration of Dov Kesselman dated September 7, 2010 ("Kesselman Decl."). References to deposition testimony will be cited as "[Deponent] Dep. [page]; [line]."

2. Mr. Kaiser repeated this story about the customer seeking a bra for large women to Lelle's husband when he called into store. (Lelle Dep. 137:9-138:15)

3. On one occasion, Mr. Kaiser allegedly placed a pair of women's "thong" underwear on over his clothes and called associates over the loudspeaker system into an office to see him. (Serraino Dep. 130:17-131:11; 140:6-23; Honick Dep. 116:14-25).

4. Connolly did not witness the "thong underwear" incident, and only heard about it later. (Connolly Dep. 98:10-99:13).

5. Kaiser allegedly commented when unloading a truck delivering packages of men's underwear that the male-models featured on the packaging must have "stuffed." (Serraino Dep. 131:22-132:5; 146:13-147:6; Honick Dep. 113:16-21; 114:3-20; Connolly Dep. 96:2-10; 115:16-116:10; Lelle Dep. 143:21-144:25).

6. On one occasion, Mr. Kaiser allegedly placed a fake flower over his clothes over his groin area and commented that he was going to go to the beach that way. (Serraino Dep. 132:6-19; 148:5-20; Honick Dep. 198:16-200:4; Connolly Dep. 99:14-100:20; 146:20-147:22).

7. Neither Honick nor Connolly were present for this "flower" incident. (Honick Dep. 198:198:12-15; Connolly Dep. 99:14-100:20).

8. Connolly did not recall any offensive comments that Mr. Kaiser made, and the only incident she was present for was when Mr. Kaiser commented about the packaging of the men's underwear. (Connolly Dep. 96:2-97:6; 98:10-100:20; 101:4-7; 112:22-113:2; 115:16-116:10).

9. Plaintiffs contend that Mr. Kaiser took small African statues and placed them in "weird" positions and made "weird" comments about them. (Serraino Dep. 150:11-151:16; Honick Dep. 113:22-114:2; 118:3-6; Lelle Dep. 150:8-19).

10. Kaiser engaged in such alleged behavior in front of male and female associates, and his comments or conduct were not directed at anyone in particular. (Serraino Dep. 96:11-97:6; 134:10-13; 147:7-14; Honick Dep. 115:4-7; 141:10-18; 145:13-17; 149:6-9; Connolly Dep. 96:11-97:6; Lelle Dep. 137:4-17).

11. Plaintiffs never objected to any of this conduct to Mr. Kaiser, asked him to stop, told him that they thought any of his conduct was inappropriate, or complained to anyone prior to Lelle's January 2005 complaint to Mr. Cabrera. (Serraino Dep. 133:4-8; 160:23-161:4; Honick Dep. 115:2-3; 128:12-129:12; Connolly Dep. 97:20-23; Lelle Dep. 142:17-25; 145:2-8; 148:19-21; 151:3-6).

12. When Human Resources interviewed each of the Plaintiffs as part of its investigation into Lelle's complaint, each Plaintiff informed Human Resources that they did not want any disciplinary action taken against Mr. Kaiser. (Serraino Dep. 158:3-22; Honick Dep. 135:2-11; Connolly Dep. 108:13-15; Lelle Dep. 194:9-21).

13. After TJX's investigation and the meeting with all staff at which Mr. Kaiser apologized, Mr. Kaiser ceased engaging in any inappropriate activity after TJX's remedial action. (Serraino Dep. 164:2-13; 165:22-166:4; Honick Dep. 138:2-19; Connolly Dep. 111:5-12; Lelle Dep. 201:21-203:9; 204:18-24).

14. Although Lelle primarily complained about Mr. Kaiser's management style and her perception that the store was not being run appropriately in her written statement and during her meeting with Mr. Cabrera, Mr. Cabrera "immediately went to the last part of the letter and said that this concerns him the most" in reference to her written statement that Mr. Kaiser "made inappropriate comments repeatedly" and that she believed he had "a warped sense of humor and focuse[d] on foul things." (Lelle Dep. 182:19-183:13). According to Lelle, "he was very

concerned with that, and he said, you know, this is something that I need to report to human resources." (Lelle Dep. 183:10-13).

**Plaintiffs' Views of the Kings Park Store Environment and Mr. Kaiser**

15.     Honick felt that the store had a "family atmosphere," that everyone was "very close to each other," (Honick Dep. 130:14-25), and that employees joked around with each other. (Honick Dep. 56:2-13; 59:17-21).

16.     Serraino described the Kings Park store as one where "everybody got along there. It was a very nice store. Everybody had a good rapport with each other and the customers," (Serraino Dep. 128:12-20), and that the store had a "family-like atmosphere" because "everybody was close." (Serraino Dep. 161:10-14).

17.     Lelle also enjoyed the fact that a "family-like atmosphere" existed at the store. (Lelle Dep. 193:9-12).

18.     Connolly liked Mr. Kaiser and she was happy working at TJX up until the moment of her termination. (Connolly Dep. 108:13-15; 120:9-13).

19.     Serraino thought that Mr. Kaiser "was a very nice young gentleman" and that she "never had a problem with him." (Serraino Dep. 299:24-300:10). She laughed at some of Mr. Kaiser's jokes (Serraino Dep. 134:14-17; 161:7-9), and when she perceived an incident to be inappropriate, she would "walk away." (Serraino Dep. 133:4-8; 151:14-16; 300:5-10.)

20.     Honick joked around with Mr. Kaiser and often laughed. (Honick Dep. 132:4-15).

21.     Honick would "ignore" Mr. Kaiser's comments and conduct if she felt they were inappropriate or "walk away," (Honick Dep. 115:2-3; 116:14-25), but none of Mr. Kaiser's comments or conduct prevented her from performing her job. (Honick Dep. 142:20-23; 143:12-16; 144:14-19).

22.     Lelle described Mr. Kaiser's actions as a case of his thinking that "he's just joking around." (Lelle Dep. 179:6-16). When Mr. Kaiser behaved inappropriately, she would "roll her eyes" and "walk away." (Lelle Dep. 142:10-16; 145:2-8).

**Loss Prevention Department's Termination Meetings with Plaintiffs**

23.     During the questioning by Loss Prevention, Plaintiff Serraino specifically asked what would happen to her employment, and the only response was, "that is a very bold question to ask." (Serraino Dep. 209:22-210:7).

24.     During Plaintiff Honick's questioning and meetings on June 24, 2005, no threat concerning her employment was made. (Honick Dep. 173:14-174:5)

25.     Plaintiff Connolly could not recall the substance of most of the conversations from the questioning and meetings on June 24, 2005, but she did not recall any threat being made. (Connolly Dep. 129:11-130:9; 131:3-18; 135:5-136:7; 138:5-13; 139:3-21).

26.     Plaintiff Lelle felt that what was coercive about the meeting was that the Loss Prevention agents began the meeting in a "friendly" manner but then became more stern. (Lelle Dep. 249:3-250:22).

27.     Plaintiffs each admitted that Mr. Cabrera's involvement with the Loss Prevention meetings was limited to coming in after they signed the admissions of wrongdoing and informing them of their terminations. (Serraino Dep. 212:12-17; Honick Dep. 172:12-173:6; 175:6-9; Connolly Dep. 142:11-18; Lelle Dep. 243:22-244:7; Mr. Cabrera Dep. 85:9-25; 131:15-132:22; 134:3-20; 135:6-9; 143:17-144-145:5; 146:4-20).

Dated: New York, New York
September 7, 2010

                        SEYFARTH SHAW LLP

                        By: <u>s/ Dov Kesselman</u>
                        Dov Kesselman
                        Brian D. Murphy
                        620 Eighth Avenue
                        New York, New York 10018
                        (212) 218-5500

                        *Attorneys for Defendants The TJX Companies, Inc., Rick Kaiser, and Armando Cabrera*

12644301v.1