UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
EILEEN CONNOLLY, <u>et</u> <u>al.</u>,

                    Plaintiffs,

          -against-                          <u>MEMORANDUM AND ORDER</u>
                                             07-CV-3282 (JS) (WDW)


THE TJX COMPANIES, INC., <u>et</u> <u>al.</u>,

                    Defendants.
----------------------------------X
APPEARANCES:
For Plaintiffs:      Larry James McCord, Esq.
                     Law Offices of Larry McCord & Associates
                     1291 Straight Path
                     West Babylon, NY 11704

For Defendants:      Dov Kesselman, Esq.
                     Seyfarth Shaw
                     620 Eighth Avenue
                     New York, NY 10018

SEYBERT, District Judge:

          Pending before the Court is (1) a motion for summary

judgment by The TJX Companies, Inc., Rick Kaiser, and Armando

Cabrera ("Defendants", "TJX", "Kaiser", or "Cabrera"), pursuant to

Rule 56 of the Federal Rules of Civil Procedure; (2) a cross-motion

for summary judgment by Eileen Connolly, Paulette Honick, Darlene

Lelle, and Lorraine Serraino ("Plaintiffs", "Connolly", "Honick",

"Lelle", or "Serraino"); and, (3) Plaintiffs' motion for sanctions

against Defendants' counsel.  For the reasons discussed below,

Defendants' motion is GRANTED, and Plaintiffs' two motions are

DENIED.

<u>BACKGROUND</u>

          From October 1998 to June 23, 2005, Plaintiffs were

employed at a T.J. Maxx retail store ("Store") in Kings Park, New York, which is owned and operated by Defendant TJX.  Defendants' Local Rule 56.1 Statement ("Def. Stmt.") ¶¶ 1-18.  In 2002, Defendant Kaiser, a male T.J. Maxx employee, was promoted to the position of Store Manager and subsequently transferred to the Store where he supervised the work activities of the Plaintiffs, who are all female.  Id. ¶¶ 25-26.

For at least one year under Kaiser's management, Plaintiffs found their work environment at the Store to be quite collegial and imbued with a warm, family atmosphere.  Defendants' Supplemental Local Rule 56.1 Statement ("Def. Supp. Stmt.") ¶¶ 15-18.  During this period, according to Plaintiff Serraino:

> "everybody got along there. It was a very nice store.  Everybody had a good rapport with each other and the customers. [The employees] had [social] functions throughout - [we had] barbeques, parties in the back, celebra[tions] every month [for] whoever's birthday it was. We had some award dinners where everybody went out together." Serraino Dep., p. 128-129.

Of Kaiser, Plaintiff Serraino testified that she considered him to be a "very nice young gentleman" with whom she "never had a problem."  Def. Supp. Stmt. ¶ 19.

As Kaiser grew more comfortable around Plaintiffs, however, he began to occasionally make off-color, ribald jokes.  In their deposition testimony, Plaintiffs specifically recount six sexual quips that Kaiser delivered over the course of three years:

1.    Relating his interaction with a T.J. Maxx customer in the

lingerie department, Kaiser told Plaintiff Lelle that the customer inquired whether the Store carried brassieres "for women with big boobs." He then wondered aloud whether this was not akin to a male customer asking "do you have jocks for big cocks?" Lelle Dep., p. 132. When Lelle's husband called the store later that day, Kaiser repeated his jockstrap simile to him. Lelle was "aghast."

2. Speaking on the Store's intercom system, Kaiser directed Serraino to proceed to his office. On entering, she observed Kaiser standing alongside his desk, wearing a pair of women's thong underwear over his pants. Kaiser then displayed his backside as he nonchalantly asked: "How do you like this? This is a pair of thong underwear." After Serraino left the office, he used the intercom system once more to call "all of the associates" to his office so they might view his attire. Def. Supp. Stmt. ¶ 3.

3. As bundles of men's underwear were unloaded from a delivery truck, Kaiser observed that the male models displayed on the packaging probably were "stuffed." Def. Supp. Stmt. ¶ 5.

4. Dangling a fake flower over his clothed groin area, Kaiser informed Serraino that he had a plan to walk along Fire Island "with just this flower." Def. Supp. Stmt. ¶ 6. Serraino further testified that Kaiser felt comfortable referencing Fire Island "because we all [knew] that he . . . at [that] point he had opened up that he would go to the beach there." Serraino Dep. p. 132. (Emphasis added.)

5.  Plaintiffs testified that Kaiser, who kept small African statuettes in his office, would arrange them in "weird" positions and offer "weird" remarks about them.  Def. Supp. Stmt. ¶ 9.

6.  Kaiser held up a certain piece of faux African artwork carried by the store, which was reminiscent of a totem-poll, and asked Lelle "what does this look like?"  Lelle Dep., p. 150.

In is undisputed that Kaiser delivered his sexual comments "in front of" male and female associates alike.  Def. Supp. Stmt. ¶ 10.  Serraino testified, for example, that he made the "stuffing" comments to both male and female associates. Serraino Dep., p. 147.  Of the same incident, Honick testified that the male employees "Rob, Rob Marin, Jon Erik Campbell" were also present.  Honick Dep., p. 141.  She also flatly stated that she did not believe that Kaiser treated her differently because she was a woman.  Id., p. 149.  Finally, Lelle testified on the subject of Kaiser's sexual comments directed toward a male employee named Dillon.  Lelle Dep., p. 429.

Apart from the mixed genders of Kaiser's intended audience, it is undisputed that the content of his sexual comments concerned both males and females ("Sometimes he'd comment about guys that came into the store. [He would say that] they have a nice butt or they're really good looking."  Serraino Dep., p. 135.)

Contrary to Defendants' Supplemental Statement of Undisputed Material Facts, there is a genuine dispute as to when

the Plaintiffs first "complained to anyone" about Kaiser's antics. The Supplemental Statement asserts that none of the Plaintiffs complained to anyone prior to January 2005 (Def. Supp. Stmt. ¶ 11), whereas each Plaintiff individually testified that at least two of the Store's assistant managers were apprised of Kaiser's behavior in advance of that date (Connolly Dep. p. 159; Honick Dep. p. 129; Lelle Dep. p. 430; Serraino Dep. p. 155). Plaintiff Serraino further testified that the assistant managers confessed that they were already aware of the issue. Serraino Dep., p. 155.

In any event, it is undisputed that on January 24, 2005, Lelle met with Defendant Cabrera, a District Manager at the time, in order to present him with a formal typed complaint, which included allegations touching on Kaiser's behavior. Def. Stmt. ¶¶ 34-35. Notably, this one-page typed statement chiefly focused on Lelle's "frustration" rooted in her belief that, by neglecting to provide her with proper instructions on condensing clearance coats, Kaiser was responsible for her "double work". Id. ¶ 37. But it also alleged that Kaiser's joking made it "very difficult to work effectively." Id. ¶ 40.

Cabrera hastily informed David Del Vecchio, the Regional Recruitment Manager, of Lelle's complaint and only two days later, Mr. Del Vecchio made a trip to the Store with his supervisor, Fran Cetrone. Id. ¶ 46. Connolly, who was the first to be interviewed by Del Vecchio and Cetrone, officially complained for the first

time about Kaiser's behavior, stating however that she knew he was "just joking." Id. ¶ 50. For her part, Honick told the investigating team "how much she liked Rick" and that the Store's employees were "like family." While she noted that Kaiser sometimes joked inappropriately, she allowed that they all did and that the staff would "all laugh and sometimes join in on the joke." Id. ¶ 56.

Next, Del Veccio and Cetrone interviewed Lelle. It is undisputed that Lelle again told the investigators that her primary gripe with Kaiser was the "double work" created through his poor management. Id. ¶ 60. On the subject of Kaiser's inappropriate comments, Lelle commented that she "usually found them funny" but nevertheless wanted them to stop. Id. ¶¶ 61-62.

The last Plaintiff to be interviewed, Serraino, admitted to the team that, although Kaiser's jokes were distasteful and inappropriate, all of the Store's staff "sometimes" got "carried away" with such jokes. Id. ¶ 66.

At length, Del Vecchio and Cetrone completed their initial investigation by speaking with other store associates, virtually all of whom raised no further concerns about Kaiser. Id. ¶ 71. Confronted with the allegations against him, Kaiser confessed to Del Vecchio and Cetrone that he occasionally cracked jokes that could be considered inappropriate. Id. ¶ 73. This acknowledgment prompted Del Vecchio and Cetrone to sternly instruct

him that he must immediately cease his questionable sexual
comments. In addition, they directed that (1) henceforward all
conversations between him and co-workers were to be strictly
business related; (2) he must apologize for all inappropriate
comments; (3) he must direct all employees to cease inappropriate
sexual or discriminatory conversations; (4) he thank the employees
for exercising their rights under the company's open door policy.
Id. ¶ 76.

Kaiser was then advised that if he transgressed company
policy one more time he would be fired. On February 1, 2005,
Kaiser called an associate meeting and apologized, as per Cabrera's
directive. Id. ¶ 78-79.

Thereafter Cabrera made weekly visits to the Store where
he was never informed by employees that Kaiser's untoward conduct
had started up again. Id. ¶ 81.

Around the same time of Lelle's first complaint to
Cabrera in January 2005, T.J. Maxx's Loss Prevention Department
commenced an inquiry into an unusual pattern of "layaway" activity
at the Store. Pursuant to written T.J Maxx policy, employees are
permitted to set aside certain merchandise and, on a later date,
purchase it as layaway. Id. ¶ 82. The policy's rules require that
the layaway merchandise be picked up and paid for within thirty
days; layaways not paid for within the thirty-day window must be
returned to the floor, which of course means that the thirty-day

period cannot be continuously renewed. Id. ¶ 84. (Any other policy would enable employees to abuse layaways to reap discounts after repeated use of the mechanism.)

The Loss Prevention Department daily reviewed layaway reports from individual retail stores which did not identify the names of any particular employee; instead, employee numbers were used. Id. ¶ 93. Therefore, Karen Hennessey, the Regional Analyst for Loss Prevention who spotted suspicious layaway activity at the Store in early 2005, was not aware of the specific employees responsible for the breaches of T.J. Maxx policy. Id. ¶ 95. Thus, it is undisputed that the investigation which culminated in Plaintiffs' dismissals was initiated by an analyst who did not know that the Plaintiffs who complained of Kaiser's activity were implicated.

At Hennessey's direction, the Loss Prevention Department tracked the patterns of layaways, markdowns and purchases of all the Store's employees. Id. ¶ 97. Neither Kaiser nor Cabrera was advised of the investigation until after it was complete, as per T.J. Maxx policy. Id. ¶ 99. The investigation revealed that Plaintiffs, along with Carol Hobel and Phyllis Ferraro (who did not complain of Kaiser's conduct), routinely violated the layaway policy by continuously rolling over their layaway merchandise after the expiration of the original 30-day period, thereby reaping numerous markdowns in price. Id. ¶ 101.

Plaintiffs' conduct, then, represented a violation of T.J. Maxx policy and it caused the Store to sustain a financial loss. Id. ¶ 104. Accordingly, Plaintiffs, Hobel, and Ferraro were interviewed by members of the Loss Prevention team. Each Plaintiff admitted in a signed confession that she violated company policy, causing a loss to its store, and signed an accompanying promissory note agreeing to cover the loss. Id. ¶¶ 112-115. There remains a factual dispute as to whether these confessions were coerced. Plaintiffs' Response to Defendants' Statement ("Pl. Resp. Def. Stmt.") ¶ 115.

Immediately after confessing to the violations, the Plaintiffs and Hobel were terminated (Ferraro decided to quit in the wake of the layaway investigation). The parties dispute the true cause of the termination. Plaintiffs allege, largely based on a proximity-in-time argument, that it was due to their complaints of sexual harassment; Defendants allege that Plaintiffs were fired for their layaway abuse automatically.

Critically, however, Plaintiffs do not dispute Defendant's factual statement that "Neither Carbrera [nor] Kaiser played any role in determining whether the Plaintiffs would be terminated; rather, when an employee violated company procedure and causes a loss to the company, termination is automatic." Id. ¶ 118.

DISCUSSION

9

I.   Rule 56: Standard of Review

     A district court may properly grant summary judgment only
"if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106
S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);
McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

     "In assessing the record to determine whether there is a
genuine issue to be tried . . . the court is required to resolve
all ambiguities and draw all permissible factual inferences in
favor of the party against whom summary judgment is sought." McLee
v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

     Mere conclusory allegations, speculation or conjecture
will not avail a party opposing summary judgment, see Kulak v. City
of New York, 88 F.3d 63, 71 (2d Cir. 1996), and "[f]actual disputes
that are irrelevant or unnecessary will not be counted." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (citing 10A
Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal
Practice and Procedure § 2725, at 93-95 (1983)).

     In discrimination cases, "trial court[s] must be cautious
about granting summary judgment to an employer when . . . its

10

intent is at issue. . . . Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994). Thus, a court should not grant an employer's motion for summary judgment unless "the evidence of discriminatory intent is so slight that no rational jury could find in [the P]laintiff's favor." Id. at 1226. Be that as it may, this deferential standard should not be applied so as to foreclose the possibility of summary judgment in all employment discrimination cases. See Weinstock v. Columbia Univ., 224 F.3d 33, 41-42 (2d Cir. 2000) ("the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" (quoting McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994)).

A.    Plaintiffs' Title VII Discrimination Claim

The anti-discrimination provision of Title VII forbids employers from ""discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

Sexual harassment, a form of gender discrimination, is proscribed by Title VII if it creates a "hostile or abusive work

11

environment." <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 66, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).

Under the <u>McDonnell Douglas</u> burden-shifting framework for Title VII cases, the burden lies initially with the plaintiff to make out a <u>prima facie</u> case for her hostile work environment (or retaliation) claim. <u>See</u> <u>Carmody v. City of New York</u>, No. 05-CV-8084 (HB), 2006 WL 3317026, at *14 (S.D.N.Y. Nov. 13, 2006).

To establish a <u>prima facie</u> case for hostile work environment under Title VII, Plaintiffs must show that the complained-of conduct (1) was objectively severe or pervasive, creating a work environment that a reasonable employee would find abusive or hostile; (2) inspired in Plaintiffs a subjective perception of hostility or abuse; and (3) was motivated by the Plaintiffs' sex. <u>See</u> <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001).

A central theme of Supreme Court hostile-environment jurisprudence, as observed by the Court itself, is that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

That male and female employees are treated similarly, if disrespectfully, gives rise to the inference that "their mistreatment shared a common cause that was unrelated to their sex"

even in the case where the harassment has sexual content. <u>Id.</u> at 254. Even so, "the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. For it may be the case that a co-worker or supervisor treats both men and women badly, <u>but women worse</u>" <u>Id.</u> (Emphasis added.) More precisely, the question is not so much whether the plaintiff's class is globally treated worse, but whether the defendant discriminated against the particular individual bringing suit. <u>Id.</u> at 253.

All the same, "Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature. Rather, it prohibits employers from discriminating against an employee (including by subjecting him or her to hostile working conditions) because of such individual's . . . sex." <u>Krasner v. HSH Nordbank AG</u>, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) (internal quotation omitted).

In suits alleging opposite-gender sexual harassment, the plaintiff may ordinarily take advantage of certain inferences which are unavailable to plaintiffs alleging otherwise. This is based on the presumption that sexual comments and actions made or undertaken by a person attracted to the opposite sex to a member of the opposite sex were motivated by the victim's gender. <u>See</u> <u>Romano v. Stora Enso Corp.</u>, No. 07-CV-4293, 2010 WL 986535, at *19 (E.D.N.Y.

Feb. 12, 2010).  It follows that when the harassment in question was directed to a gender to which the harasser is unattracted, the plaintiff may not take advantage of such inferences.

1.  <u>The Complained-of Conduct was not Gender Based</u>

The Plaintiffs have testified that Kaiser's untoward comments were directed to female and male employees alike.  Asked whether Kaiser made his "stuffing" comments to both males and females, Serraino testified that this was the case.  Serraino Dep., p. 134.  She further testified that Kaiser made sexual comments regarding males: "he'd comment about guys that came into the store. [He would say] they have a nice butt or they're really good looking." Serraino Dep., p. 135.

Honick, for her part, testified that the same comments were made to men as well, and that Kaiser did not treat her differently because she was a woman.  Honick Dep., p. 141. Subsequent to her deposition, Honick filed a self-serving affidavit in which she repeatedly declares that all of Kaiser's quips were "sex based".  Honick Aff., p. 2-5.  Quite apart from the rule that a party may not create an issue of fact by submitting this sort of affidavit in opposition to a motion for summary judgment contradicting previous deposition testimony, <u>see Hayes v. New York City Dept. of Corrections</u>, 84 F.3d 614, 619 (2d Cir. 1996), Honick's affidavit betrays a mistaken understanding of what it means for a comment to be gender based; in it, she testifies that

14

"Kaiser had sex-related ideas on his mind constantly, so he was always making remarks that were sex based." Honick Aff., p. 3. Yet a comment is not gender based for Title VII purposes merely because it is sexual. See Brown, 257 F.3d at 254.

Finally, Lelle testified that Kaiser repeated to her husband his remark about the size of a woman's brassiere. Lelle Dep., p. 137. Connolly, who testified that she could not recall whether Kaiser made comments to both genders, filed a conclusory follow-up affidavit directly contradicting her deposition testimony by declaring that Kaiser's actions were sex based. Connolly Aff., p. 3.

While it is true enough that a sexual harassment claim may not be short-circuited by the mere fact that both men and women are involved, Brown, 257 F.3d at 254, Plaintiffs' evidence is insufficient to allow a reasonable jury to conclude that Kaiser's comments were motivated by Plaintiffs' gender or that Kaiser treated "[these particular] women worse." Id. Serraino, for instance, testified in connection with the thong incident that Kaiser used the intercom system to call "all of the associates" to his office so they might view his attire. Def. Supp. Stmt. ¶ 3. (Emphasis added.)

What is more, the parties' depositions yield indications that this is not the ordinary opposite-gender sexual harassment case in which the Court would grant certain inferences to

Plaintiffs.  Namely, they show that the Store's employees understood that their manager, Kaiser, was gay.  Serraino, for instance, testified that she knew Kaiser was gay and that he had confided his orientation to Assistant Manger Lori Wachtel.  Serraino Dep., p. 155-156.  She further testified that Kaiser felt comfortable referencing Fire Island "because we all [knew] that he . . . at [that] point he had opened up that he would go to the beach there."  Serraino Dep., p. 132 (emphasis added); see also Honick Dep. p. 132.  Thus the Court may not draw the inference in Plaintiffs' favor that, because Plaintiffs and Kaiser were of the opposite sex, Kaiser's sexual comments were likely gender based.  Given Kaiser's apparent orientation--coupled with his propensity to make sexual comments to males too--the Court emphatically answers in the affirmative the question "would the complaining employee have suffered the harassment had he or she been of a different gender?"

Indeed the evidence could well be read to indicate that the complaining employees would have suffered greater harassment had they been males.  That is because virtually every sexual comment or behavior cited by the Plaintiffs demonstrates Kaiser's crude fixation on male anatomy and maleness per se.  Everything from his "do you have jocks for big cocks" comment, to his flaunting of female underwear over his pants, to his question whether male models displayed on underwear packaging "stuffed", to

16

his comments that he planned to traverse Fire Island (a notable gay destination) with just a flower covering his body parts, to his insinuation that a piece of faux African artwork looked phallic, to his comments about the attractiveness of male customers' posteriors, argues against Plaintiffs' contention that they were the audience of these remarks solely because of their gender.

It is not enough merely to offer evidence that on particular occasions the Plaintiffs happened to be alone with Kaiser when he made his off-color comments; Plaintiffs must, but do not, offer evidence that this behavior was solely aimed at them due to their sex, or that the female plaintiffs were treated worse than the male employees by Kaiser. To the contrary, they have offered evidence that Kaiser's comments were directed toward both sexes and but not that those comments were more often aimed at them than males. And even if the Court assumes <u>arguendo</u> that a small subset of his indiscreet remarks were gender based (such as the remark about big breasts), these few and isolated remarks fail different elements of a sexual harassment claim, as discussed <u>infra</u>.

2. <u>The Severity or Pervasiveness of Kaiser's Comments</u>

To prevail on their hostile work environment claim, Plaintiffs must also show that the Store was "so permeated with discriminatory intimidation, ridicule, and insult" and so "severe or pervasive" that it altered the conditions of their employment. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 114 S. Ct. 367,

L. Ed. 2d 295 (1993).  Relatedly, Plaintiffs must establish that,

subjectively, they regarded their work environment to be abusive.

See Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).

"Isolated, minor acts or occasional episodes do not

warrant relief." Brennan v. Metropolitan Opera Ass'n, Inc., 192

F.3d 310, 318 (2d Cir. 1999).  However, there is no fixed number of

harassing episodes through which a plaintiff must suffer in order

to bring a successful Title VII claim; instead, the nature,

severity, and frequency of the conduct are examined, viewing the

circumstances in their totality.  See Alfano v. Costello, 294 F.3d

365, 379 (2d. Cir. 2002).

An examination of the hostile work environment decisions

in this Circuit leaves the Court convinced that Plaintiffs' proof

is insufficient to reach the finder of fact.  Upholding a dismissal

of a plaintiff's sexual harassment claim on the ground of

insufficiency of the evidence, the Alfano court approvingly cited

the following instructive decisions reaching the same result but

which involved more severe and pervasive conduct:

> Quinn v. Green Tree Credit Corp., 159 F.3d
> 759, 768 (2d Cir. 1998) (an appreciative
> comment about plaintiff's buttocks and a
> deliberate touching of her breasts); Celestine
> v. Petroleos de Venezuella SA, 266 F.3d 343,
> 354 (5th Cir. 2001) (in a twenty-five-month
> period, eight incidents of alleged racial
> harassment); Shepherd v. Comptroller of Pub.
> Accounts, 168 F.3d 871, 872-75 (5th Cir. 1999)
> (in a two-year period, co-worker made
> impertinent and intimate observations about
> plaintiff's anatomy, attempted to look down

her shirt, and touched her multiple times); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (in a four-month period, repeated sexual jokes, and at least five other sexually offensive remarks); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (in a seven-month period, nine sexually offensive incidents, including repeated references to plaintiff as a "pretty girl," grunting noises when she wore leather skirt, and one episode of simulated masturbation); Hocevar v. Purdue Frederick Co., 223 F.3d 721, 735-36, 738 (8th Cir. 2000) (in a three-year period, several sexually derogatory remarks about women by one or more men, a sexual advance at a company dance, disruption of plaintiff's presentation by talking followed by comment on her legs, and a lascivious remark in a group setting by a company official predicting his sexual conquest of three female employees); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (in a sixteen-month period, five sexually offensive statements, including one made while harasser had his arm around the plaintiff and was peering down her dress); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th Cir. 1998) (in a three-year period, harasser made remarks concerning plaintiff's bra strap, her underclothing, and whether she had sexual dreams; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and took the plaintiff to a Hooter's restaurant on business travel (six total incidents)); Mendoza v. Borden, Inc., 195 F.3d 1238, 1248-49 (11th Cir. 1999) (in an eleven-month period, harasser once made inappropriate physical contact, made one arguably offensive statement, and several times made disgusting noises while staring impertinently), cert. denied, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000). Alfano 294 F.3d at 379.

In Nieves v. District Council 37, AFSCME, a plaintiff alleged that, in roughly a one-year period, her supervisor (a)

constantly commented on her physical appearance; (b) sent her e-mails containing pornography; (c) inserted his fingers into a condom and then waved them in the area of plaintiff; (d) blew kisses at her; (e) "jokingly" asked her to take a nude picture of him; (f) instructed her to open a drawer he knew to be filled with condoms; and (g) made five comments about how plaintiff would stay in the same room as a male colleague during a business trip. No. 04-CV-8181 (RJS), 2009 WL 4281454, at *1-3 (S.D.N.Y. Nov. 24, 2009).

After summarizing these allegations, the court held that:

> While undoubtedly inappropriate and in poor taste, the alleged conduct is not, taken as a whole, sufficient to sustain a reasonable finding of a hostile work environment in light of the "remarkably high" standard imposed by the Second Circuit. The conduct was relatively infrequent; the most serious conduct, Schleicher's allegedly inappropriate e-mails, consisted of only three messages. There is no evidence in the record that Plaintiff felt physically threatened or humiliated by any of the conduct that she claims to have experienced. <u>Id.</u> at 6.

The indecent conduct described in <u>Nieves</u>, which comprised approximately eight episodes occurring over the course of a single year, represents harassment considerably more severe and pervasive than what Plaintiffs complain of here. For one thing, unlike in <u>Nieves</u> and, for that matter, in virtually every case approvingly cited by the <u>Alfano</u> court <u>supra</u>, the harasser here never once made disparaging, sexual or humiliating comments <u>concerning the</u>

20

Plaintiffs. Rather, although Plaintiffs were among Kaiser's intended audience, there is no allegation that he ever thought of Plaintiffs in sexual terms, much less that he gave voice to such thoughts. Moreover, Kaiser's conduct never featured physical contact or threats. Second, Plaintiffs' allegations are episodic and dispersed over a time period twice as long as that in Nieves.

Beyond the objective factors, Plaintiffs' testimony clashes with their contention that they subjectively perceived a work atmosphere permeated with discriminatory intimidation, ridicule, and insult. And "[t]he gravamen of any sexual harassment claim is that the alleged sexual [comments] were 'unwelcome.'" Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). Serraino testified, for instance, that she considered Kaiser to be a "very nice young gentleman" with whom she "never had a problem." Def. Supp. Stmt. ¶ 19. Further, she went so far as to state that she even laughed at some of the very jokes that now make up her harassment claim. Serraino Dep., p. 161. She also testified that she "might have" told Del Vecchio and Cetrone that she considered the Store's work atmosphere to be "family-like" and that, in any case, everybody who worked there was close. Id. Honick testified that, being able to "ignore" Kaiser's behavior, she was never prevented from performing her job. Honick Dep., p. 142-143. Occasionally, Honick recollected, she would share jokes with Kaiser. Id. at 132. For her part, Connolly plainly conceded

in her deposition that she was perfectly happy working at the Store until the very moment of her termination.  Connolly Dep., p. 108.

The Court cannot but conclude that this is not evidence that would lead a reasonable jury to find that the Plaintiffs subjectively felt that Kaiser's episodic remarks were so abusive as to alter their conditions of employment.

### 3. Plaintiffs' Hostile Work Environment Claims do not Lie Against The Individual Defendants

Plaintiffs' Title VII claims must be dismissed with respect to the individual Defendants Kaiser and Cabrera for the additional reason that individuals are not subject to liability under Title VII.  See, e.g., Sassaman v. Gamache, 566 F.3d 307, 315-16 (2d Cir. 2009).

### B. Plaintiffs' Retaliation Claims

Under the McDonnell Douglas burden-shifting framework for Title VII cases, the burden lies initially with the plaintiff to make out a prima facie case for her retaliation claim.  See Carmody v. City of New York, No. 05-CV-8084 (HB), 2006 WL 3317026, at *14 (S.D.N.Y. Nov. 13, 2006).

To establish a prima facie case on their Title VII retaliation claim, Plaintiffs must demonstrate with admissible evidence that: (a) they engaged in a "protected activity"; (b) their participation in the activity was known to the employer; (c) they sustained an adverse employment action; and (d) there is a

causal connection between the protected activity and the adverse employment action. See, e.g., Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). A plaintiff engages in protective activity when she has a good faith, reasonable belief that the conduct she complains of constituted statutorily prohibited discrimination. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

A retaliatory motive need not be the sole cause of the adverse employment action in order to satisfy the causal element. See Fleming v. MaxMara, USA, 644 F.Supp.2d 247, 264 (E.D.N.Y. 2009). That is to say, if a defendant establishes a legitimate, non-retaliatory justification for the adverse employment action, a plaintiff may nevertheless rebut by proving that retaliatory animus was a "motivating factor" without having to disprove the employer's proffered justification. Id. Finally, if the plaintiff carries that burden, the burden shifts to the employer to prove (as an affirmative defense) that it would have taken the same adverse employment action even if there were no retaliatory animus. See Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119-20 (2d Cir. 1997).

Here, Plaintiffs' proof comes up short at nearly every element of their retaliation claim. It is undisputed that T.J. Maxx's written employee rules require that layaway merchandise be picked up and paid for within thirty days, that layaways not paid

for within the thirty-day window must be returned to the floor, that Plaintiffs, along with other Store employees, failed to comply with the rule and that when they were hired Plaintiffs signed the Defendant's "Field Post Orientation Check List" acknowledging that they could be immediately discharged for acts of dishonesty or failure to follow established job protocols. Def. Stmt. ¶¶ 82, 84, 101, 116.

It is likewise undisputed that the investigation which culminated in Plaintiffs' dismissals was initiated by an analyst who did not know that the complaining Plaintiffs were implicated in layaway abuse. <u>Id.</u> at 93, 95. Perhaps most critically, Plaintiffs do not dispute Defendants' statement of fact that "Neither Cabrera [nor] Kaiser played <u>any</u> role in determining whether the Plaintiffs would be terminated; rather <u>when an employee violates company procedure and causes a loss to the company, termination is automatic</u>." <u>Id.</u> at 118. (Emphasis added.)

In other words, Plaintiffs do not dispute the fact that the one T.J. Max Manager (Cabrera) to whom they complained and who conceivably could have been behind any retaliatory animus involved in the adverse employment action had no hand in the firings.

True, Cabrera quickly informed Del Veccio and Cetrone – personnel from Human Resources – of Lelle's complaint. But Plaintiffs offer no evidence whatsoever that either had any role in the adverse employment actions. To the contrary: Plaintiffs

concede that employee violations of company procedure result in automatic termination. Id. at 118. To the extent that Plaintiffs argue that Carbrera's knowledge should be imputed to Defendant TJX regardless of whether they can show that the actual decision-makers knew about Plaintiffs' complaining, they are incorrect. See Laurin v. Pokoik, No. 02-CV-1938, 2005 WL 911429, at *5 (S.D.N.Y. Apr. 18, 2005).

Of course if Plaintiffs cannot prove that the decision makers behind their firings had knowledge of their protected activity, they necessarily cannot further satisfy the requisite causation element. But even if the Court assumes arguendo that they did have such knowledge, Plaintiffs offer nothing but temporal proximity in the way of causation evidence. Against this meager evidence, Defendants adduce the much more direct facts that at least two employees who did not engage in protected activity--Carol Hobel and Phyllis Ferraro--were similarly investigated for layaway violations, as a result of which neither continues to work for the Store. Def. Stmt. ¶ 114. While Plaintiffs purport to identify other Store employees who violated the layaway policy but who were not terminated, absolutely no evidence is offered as to the scope, nature or timing of their violations; the argument, in other words, is completely unsubstantiated.

Lastly, although Plaintiffs appear to concede that they may not pursue Title VII claims against the individual Defendants,

they maintain that their supplemental state law retaliation claims should reach the jury. The Court disagrees. As to Kaiser, Plaintiffs argue that he is liable under an aiding and abetting theory given that he "went along with the whole deal." Pl. Opp. 28. This argument is supported by nothing but that conclusory assertion itself and, in any case, is foreclosed by the undisputed fact that "neither Cabrera [nor] Kaiser played a role in determining whether the Plaintiffs would be terminated." Def. Stmt. ¶ at 118.

As well, Plaintiffs offer no proof of Cabrera's involvement in the adverse employment action and actually concede the opposite. Id.

Accordingly Plaintiffs' retaliation claims are dismissed.

II. TJX'S Counterclaims

Together with its Answer, Defendant TJX filed counterclaims to enforce the promissory notes signed by Plaintiffs Honick and Connolly in which they respectively promised to repay $2,000 and $1,624.69 in damages caused by their misuse of the layaway perk.

In response, Plaintiffs filed a procedurally deficient[1] cross-motion for summary judgment that systematically conflates the issues pertinent to their own claims with those pertinent to

---

[1] The Court's resolution of Plaintiffs' cross-motion on the merits obviates discussion of the various deficiencies TJX flags.

Defendant TJX's, misstates the record, and is bereft of relevant legal principles.

The cross-motion argues in the main that TJX's attempted enforcement of the two promissory notes must fail because the layaway losses prompting their creation were, mysteriously, not in fact losses. "Losses", Plaintiffs inform the Court, "occur only when sales are not made" and "unless the price paid was less than the cost of the item to the seller, no loss can occur. It is just not possible." Pl.'s Mem. at 4.

The only impossibility the Court discerns involves counting the number of ways in which this argument errs. First, Plaintiffs cite no legal authority for this proposition. But that does not leave the Court surprised because, second, the proposition is logically unsound. As is made clear by the Hennessey and Forgette affidavits, TJX created and maintained its layaway policy precisely because in its absence employees would be able to take advantage of successive merchandise discounts, thereby preventing the store from selling the merchandise for a higher price; the loss lies in the difference between the successively marked-down price paid by the employee and the higher shelf price paid by a customer who does not benefit from the layaway perk. Hennessey Decl. ¶ 4; Forgette Decl. ¶ 8.

Third, even if the Plaintiffs had cited authority for their abstract and crabbed definition of loss, the question becomes

what purpose it would serve in their effort to dismiss TJX's claims on the promissory notes. Those claims raise before the Court the issue whether the notes are enforceable contracts, not the circumstances and motivations prompting their creation. In quibbling over the legal meaning of loss and whether the Plaintiffs were responsible for any sustained by the Store, Plaintiffs confuse the issue over whether they were pretextually terminated (which pertains to <u>their</u> retaliation claims) with the issue whether the notes should be enforced.

Fourth, Plaintiffs Connolly and Honick, the notes' signatories, both admitted that their violations of layaway policy caused losses to the store. Kesselman Decl. Exhs. P, Q, T, U.

Fifth, again assuming <u>arguendo</u> that Plaintiffs' definition of loss were correct, they furnish the Court with no evidence at all that the complained-of layaway transactions did not cause a loss as the term is uniquely defined by them. That is, they offer no evidence as to the price they paid or the cost to TJX.

Sixth, although it is Plaintiffs' burden to establish that there is no disputed issue of material fact, they instead <u>create</u> an issue of fact when they argue that the admissions were coercively obtained by TJX, which disputes that view.

For the foregoing reasons, Plaintiffs' cross-motion for summary judgment is DENIED.

III. <u>Plaintiffs' Motion for Sanctions</u>

On June 24, 2010, Plaintiffs filed a letter motion for sanctions under Fed. R. Civ. P. 11(b) against counsel for TJX, arguing that TJX's pre-motion conference letter attempted to improperly influence the Court by characterizing the Plaintiffs' layaway activity as admittedly fraudulent. Apparently, Plaintiffs' counsel first took issue with this characterization in a May 6, 2010 letter to defense counsel in which the former threatened to file the sanctions motion now under consideration if the latter would not agree to retract the reference to fraud. Pl. Mem., Ex. B. TJX promptly replied that it considered the motion frivolous and warned that if such a motion were filed it would seek costs and fees. Def. Mem., Ex. B.

During the May 14, 2010 pre-motion conference, TJX brought the issue to the Court's attention and clarified that, though Plaintiffs did indeed admit in writing to the layaway misuse, they had not admitted to fraud. Def. Mem., p. 3. After the Court instructed the parties to resolve the quarrel without the Court's intervention, Defendants' counsel proposed to submit a letter to the Court making clear that TJX's controversial pre-motion letter was not intended to suggest that Plaintiffs admitted to fraud but only to the misuse of the layaway purchase perk. <u>Id.</u> Although Plaintiffs' counsel demurred, Defendants' counsel followed up on several occasions with the same proposal.

Because Rule 11 sanctions represent a drastic, extraordinary remedy, courts seldom issue them and then only as a "(very) last resort." <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, No. 04-CV-5316 (RMB), 2006 U.S. Dist. LEXIS 71091 (S.D.N.Y. Sept. 28, 2006). Put another way, a Rule 11 motion may not be granted "unless a particular allegation is utterly lacking in support." <u>O'Brien v. Alexander</u>, 101 F.3d 1479, 1489 (2d Cir. 1996).

To put it mildly, Plaintiffs protest too much. First, while there may be no factual support for the assertion that the Plaintiffs admitted to fraud, it is unclear whether this is what TJX intended to convey in its letter. TJX maintains that it merely intended to impart to the Court that the Plaintiffs admitted to the layaway conduct, which could then be characterized as fraudulent. In any event, under Fed. R. Civ. P. 11(c)(2), a Rule 11 motion "must not be filed or be presented to the court if the challenged papers, claim, defense, contention or denial is . . . appropriately corrected"; TJX both cleared up the ambiguity at the May 14, 2010 pre-motion conference and endeavored to resolve the issue with Plaintiffs' counsel who proved uncompromising.

The motion is DENIED.

<u>CONCLUSION</u>

For the foregoing reasons, with respect to Plaintiffs' hostile work environment and retaliation claims, the Court GRANTS

Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and DENIES Plaintiffs' cross-motion for summary judgment and its motion for sanctions.

Accordingly, the only claims remaining is Defendants' motion to enforce promissory notes. The Court recommends that the parties attempt to resolve this issue and notify the Court within thirty (30) days.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      Central Islip, New York
            December ___30___, 2010